## Case No. 10,873.

In re PEARCE.

[21 Vt. 611; 6 Law Rep. 261; 2 N. Y. Leg. Obs. 267.]

District Court, D. Vermont. July, 1843.

BANKRUPTCY — OBJECTION TO DISCHARGE — OMISSION FROM SCHEDULE—WHAT IS AN UNLAWFUL PREFERENCE.

1. The objection to a bankrupt's discharge, on the ground that he has not made a full disclosure of his property, involves a charge of fraud and perjury, and ought to be substantiated by direct testimony, or by such facts as afford unequivocal circumstantial evidence of it.

2. The fact that a bankrupt has omitted to state in his schedule demands due to him, which were really worthless, does not tend to prove him guilty of fraud.

3. A voluntary payment, or transfer, by an insolvent debtor, who is going on with his business, with a bona fide intention and expectation of saving himself from failing, and of paying his debts, is not an unlawful preference, within the meaning of the bankrupt law.

4. A voluntary conveyance, by an insolvent debtor, of a portion of his property, made in the

ordinary course of business, will not justify an inference, that the transfer was made in contemplation of bankruptcy; but it must appear, that the debtor acted in the anticipation of failing in his business, of committing an act of bankruptcy, or of being declared bankrupt at his own instance, on the ground of inability to pay his debts, and intending to defeat the general distribution of effects, which takes place under a proceeding in bankruptcy.

[Cited in Buckingham v. McLean, 13 How. (54 U. S.) 167; Doan v. Compton, Case No. 3,-940.]

[Cited in Tisdale v. Norton, 8 Metc. (Mass.) 388.]

5. But where a debtor was irretrievably insolvent, and had actually failed and stopped business, his failure being notorious, and, when under immediate apprehension of being committed to jail for debt by one of his creditors, he transferred a part of his property to another creditor, without any request or demand on his part, to an amount exceeding his debt, and soon after became a voluntary bankrupt, it was *held*, that the transfer was such an unlawful preference, as ought to deprive the bankrupt of his discharge.

This was a petition by Alonzo Pearce, a bankrupt, one of the partners of the firm of Walbridge, Pearce & Co., for a discharge.

PRENTISS, District Judge. The objections filed in this case by the opposing creditors, although somewhat multifarious as well as numerous, may be classed under two general heads: 1. That the bankrupt has not made a full disclosure of his property in his schedule, but has fraudulently concealed property. 2. That he has given unlawful preferences to particular creditors by certain payments, securities, and transfers of property. These two general objections seem to comprise the whole case, as presented by the proofs.

1. Under the first head of objections, the concealment of property, an argument was urged with much earnestness by counsel, founded on the apparent difference between the state and condition of the partnership affairs, as exhibited by the inventory taken in April, 1840, and the state and condition of the partnership affairs, as represented in the bankrupt's schedules, filed in April, 1842. It was said, that, as the inventory showed a surplus of assets of between two and three thousand dollars over all liabilities, and the schedules show outstanding debts, now unsatisfied, of more than four thousand dollars, with no assets to pay them, it cannot be supposed, that so great a loss, being a difference of between six and seven thousand dollars, could arise in the course of the partnership business in the short period of two years; and therefore, it is said, it must be presumed, that property is wrongfully withheld. Upon this it may be observed, in the first place, that concealment of property involves, not only a charge of gross fraud, but also the crime of false swearing, and such being the nature of the charge, it ought to be substantiated, either by direct testimony, or by such facts, as afford unequivocal circumstantial evidence of it. It certainly ought not to be taken as true upon any slight or ambiguous presumptions, nor upon any state of facts, which do not clearly, and indeed almost necessarily, call for such an inference. Now, there are many ways, in which the supposed loss may be accounted for, without imputing any actual fraud to the bankrupt; such as by an over estimate of the property at the time of taking the inventory, —by debts turning out to be bad, which were then supposed to be good,—or by the general depreciation, which is known to have taken place in the value of property. There is no certainty, nor indeed any high improbability, that such are not the true causes of the loss; but, at any rate, it would be too much to say, in the absence of all proof on the subject, that the loss is to be imputed, not to any such supposable causes as these, but to positive fraud and wilful misconduct on the part of the bankrupt. But it is to be noticed, that the debts of four thousand dollars, still remaining unpaid, are, some of them, secured by mortgages on the property, and the property still stands as security for them; so that the loss is not so great as has been computed. Besides, it is to be remembered, that in November, 1840, all the property of the partners was attached; and goods and other personal property, estimated at $4,000, were sold on executions in December, 1840, for about $1,500. Here was a sacrifice at once of something like $2,500; and it is not too much to suppose, that, in the shifts and turns the partners were obliged to make under the difficulties then pressing upon them, other considerable sacrifices may not also have been incurred. But looking to the inventory, I should form a different opinion from that expressed by the counsel, as well as from that which seems to have been entertained by those who made the inventory. The inventory represents the joint and separate assets, that is, the partnership and private property, at $13,958, and the liabilities at $11,833, making the partners good for $2,867. But it is to be noticed, that, to make out this surplus, there was included in the account of assets a debt of $2,-668 against the old firm of Walbridge & Pearce, when it is conceded, that that firm was insolvent at the time for at least $686. So that really there was no surplus. And my conclusion would be, considering the magnitude of the liabilites, and the nature of the assets, that the partnership and the individuals composing it were in fact then insolvent. Such, I think, is the fair conclusion, especially when it is considered, that the whole surplus made out consisted of a debt due from two of the partners themselves.

As to the small amount of demands set forth by the bankrupt in his schedule as belonging to the firm, it appears, that in the summer of 1840 notes to the amount of $2,000 were turned out to pay Henry Gassett & Co.

and certain other creditors; and that in November of the same year all the partnership accounts were assigned to Hicks & Dwinnell, to pay, first, certain debts due them and certain liabilities they then incurred as sureties; then to pay certain other creditors particularly named; and the residue, if any, to pay creditors residing in the county of Washington. This, it is to be observed, was an absolute assignment in trust to pay creditors, leaving no residuum whatever in the bankrupt and his partners; and Dwinnell testifies, that enough has not been collected out of the accounts to pay even the preferred creditors particularly named. It also appears, that in November, 1840, notes to the amount of $325 were assigned to Israel Dwinnell and Stephen Pearce, and notes to the amount of $350 to Shubael Wheeler, to pay or secure them for signing notes of an equal amount; and the balance, if any, in the hands of Wheeler, as well as the balance, if any, in the hands of Asa Alden, to whom it seems, there had been a previous assignment of notes, was on the fifth of August, 1841, assigned to Asahel Pearce, to pay a debt due him from the firm, of $334. These assignments, all of which, except the two first, are set forth in the bankrupt's schedule, go far to account for the demands of the firm, and to show how they have been disposed of. As to the demands of the old firm of Walbridge & Pearce, the bankrupt says, he did not insert them in his schedule, because most of them were outlawed, and he considered them of no value. Now I do not see how it can be said, that a bankrupt is guilty of fraud, or of a willful concealment of property, by omitting to specify in his schedule a mass of obsolete and worthless demands, upon which no action whatever can be maintained. The omission cannot be supposed to proceed from any fraudulent intent, or from any wilful design to conceal property, especially in this case, when it appears that these demands were afterwards delivered to the assignee under the bankruptcy. As to the goods in the store claimed by Dwinnell & Pearce, and the notes claimed as being assigned to them for goods taken by the bankrupt out of the store, the question depends upon the fact, whether the goods and notes belonged to Dwinnell & Pearce, or were in truth the property of the bankrupt. If they were not the property of the bankrupt, he was not bound to state them in his schedule, and indeed could not properly do so. The question, as I have said, is a question of fact, and must be decided upon the testimony taken in the case. Now Dwinnell & Pearce testify, that they purchased, of the goods sold on execution in December, 1840, to the amount of seven hundred dollars; that they afterwards purchased about five hundred dollars' worth of new goods; that they put all the goods into the store, and employed the bankrupt as their agent to sell them. They also say, that they gave public

notice, by advertising in the public papers, that they had opened a store, and that the bankrupt was their agent to transact the business. They farther say, that the bankrupt had no interest whatever in the goods, but had liberty to dispose of goods to purchase in the company debts, on condition of turning out good notes, or other property, to pay the amount; and that he took out of the store, in the course of the year, goods to the amount of five hundred dollars, and in February, 1842, delivered them a written list of notes amounting to seven hundred dollars, in payment,—a copy of which list is annexed to the testimony. They also say, that the notes were delivered into their possession in February, but were afterwards left at the store, in the care of the bankrupt, to collect or secure for them. Some, they say they collected and secured themselves; and some, they say, never can be collected.

Such is the testimony of the witnesses on the part of the opposing creditors; and as the creditors cannot be allowed to discredit their own testimony, it must have its full weight in favor of the bankrupt. The effect of the testimony, as it appears to me, is to prove the goods to be in fact the property of Dwinnell & Pearce, and to make out a transfer of the notes to them before the filing of the bankrupt's petition; and of course he could not claim either the goods or the notes as his property in his schedule. There is, then, on fairly weighing the testimony, no evidence to support the objection of a wilful concealment of property.

2. The next inquiry is, under the second head of objections, whether the bankrupt has given preferences to particular creditors, so as to preclude him from a discharge. And here it may be observed, that it is unnecessary to go into any of the transactions which took place before the passing of the bankrupt act, because there is no evidence to warrant the conclusion, that any of the payments or transfers made before that time were made in contemplation of the passing of the law. The inquiry will of course be confined to transactions, which took place since the passing of the law, and to such transactions only, as have been specified and relied upon as preferences, and concerning which some proof has been given. All the transactions of this character, except one, appear to be quite free from difficulty. The payments to Town, Pearce, and Rich, rest solely and entirely upon the testimony of the bankrupt himself, whom the creditors have chosen to examine for the purpose of proving the payments. He says, that each of these payments was made on application and demand of the creditor; and that being the case, and the payments not appearing to be out of the ordinary course of business, they cannot, in my opinion, under the circumstances stated in regard to them, be treated as fraudulent preferences. But the payment or transfer to Dwinnell & Pearce is presented by the proofs

in a different aspect; and I confess, that with every disposition to view the transaction in the most liberal and favorable light, I have not been able to overcome the difficulties which attend it. It is evident enough, that the bankrupt and his partners, at the time this transfer was made, were irretrievably insolvent. About this there can be no question. It is also the fair inference, from the testimony, that the transfer was voluntary on the part of the bankrupt; for it seems, that he not only made and delivered the list of the notes to Dwinnell & Pearce without request, but that he afterwards sent the notes to them by a messenger, without any demand or solicitation on their part.

The question, then, is, was this transfer a preference, within the meaning of the bankrupt law? It is difficult, and indeed impossible, to reconcile all the decisions to be found in the books applicable to this question. In some cases it is held, that a payment by a debtor in insolvent circumstances, voluntarily made, is presumptive evidence of a preference; in others, it is held, that you cannot infer a contemplation of bankruptcy from mere insolvency. I think the latter the sounder and better opinion. I think, a transfer being voluntary and while the debtor is in a state of insolvency, when it is only of a part of his property, and does not appear to be out of the ordinary course of business, is not enough. I think it must appear, that the debtor, in making the transfer, though he did it voluntarily and while in fact insolvent, acted in contemplation of bankruptcy, that is, in anticipation of breaking or failing in his business, of committing an act of bankruptcy, or of being declared bankrupt at his own instance, on the ground of inability to pay his debts, and intending to defeat the general distribution of effects, which takes place under a proceeding in bankruptcy. A man may be insolvent, and yet go on with his business with the real hope of retrieving his affairs, and with a bona fide intention and expectation of saving himself from breaking or failing, and of being able to pay his debts; and a payment or transfer under such circumstances, though voluntary, would not be a preference within the meaning of the law. But in the present case, there was something more than mere insolvency. The bankrupt and his partners were not only hopelessly insolvent at the time of the transfer, but they had actually failed and stopped business. Their failure was complete and notorious some time before. Dwinnell, Pearce, and the bankrupt himself, in their testimony, all speak of the failure as having been complete and irretrievable. And in that condition of absolute insolvency and known actual failure, what does the bankrupt do? Why, instead of effecting a compromise with his creditors upon equal terms as to all, he voluntarily pays certain creditors in full, leaving a large mass of other creditors wholly unpaid. He transfers to Dwinnell & Pearce, without any demand or request on their part, notes to the amount of seven hundred dollars to pay a debt of five hundred, and does not so much as notice or set up any claim against them for his full year's services as their agent. And he does this, while under the apprehension and just on the eve of being committed to jail upon an execution in favor of one of his creditors, from which, it seems, he was afterwards discharged on taking the poor debtor's oath. He thus strips himself at once, of all his remaining property, except a mere trifle, and in about two months after, whether more or less does not distinctly appear, he files his petition in bankruptcy. If a transfer of property of such an amount, under such circumstances, followed up, as this was, in a short time after, with a proceeding in bankruptcy instituted by the bankrupt himself, is not held to be a preference given in contemplation of bankruptcy, with intent to defeat the equality among creditors secured by the bankrupt law, I do not see, but that the main object of the law might be defeated in every case of voluntary bankruptcy whatever; since the party in every such case is at liberty to choose his own time, and apply for the benefit of the law whensoever he pleases. It does not appear to me, that the question is in any way affected by what is stated to have been the agreement or understanding with Dwinnell and Pearce. They say, that the bankrupt had liberty to take up goods from the store on his own account, on the condition of turning out good notes, or other property, to pay for them; that is, any good notes or other property. There was no specific appropriation, by the agreement, of these particular notes to pay for the goods, but the agreement was general. Under it the bankrupt became a debtor to Dwinnell and Pearce for what goods he took up and charged himself with from time to time, with the right to pay in any good notes or other property; and Dwinnell and Pearce became his creditors, having a debt against him, with the same rights as other creditors.

Upon the whole, I do not see how this payment or transfer can be regarded in any other light, than as an unlawful preference within the sense and intent of the bankrupt law. The general character of the bankrupt, as well as his deeply embarrassed condition, would render it more desirable, as well as agreeable, to have been able to come to a different conclusion. But we must take the law as we find it; and as Lord Ellenborough said in another case, whatever may be the personal wishes or feelings of the court, it is not at liberty to disregard established principles, or sanction any transactions which a just construction of the law forbids. The consequence is, that a certificate of discharge must be refused.