Bloodgood *v.* Beecher.

———————

FRANCIS W. BLOODGOOD AND ANOTHER *vs.* ALVA B. BEECHER AND ANOTHER.

The insolvent act of 1853 makes void against creditors all conveyances made by a debtor in failing circumstances, with a view to insolvency, and with an intent to prefer particular creditors. It was found with regard to a mortgage given to a creditor that it was made by the debtor knowing that he was then insolvent, not with the intention of stopping payment or closing his business, but to prevent interruption and to avoid an assignment, and in hope that he might be extricated from his embarrassments; that he gave the mortgage upon the urgent demand of the creditor; that the debtor knew that, if placed on record, the mortgage would become a valid security in sixty days unless insolvent pro-

ceedings were instituted, and believed that if recorded it would precipitate his failure, but expected that it would not be immediately recorded. The mortgage was in fact put on record and the debtor a few days thereafter went into insolvency. In a suit to foreclose the mortgage, in which the trustee in insolvency contested its validity, it was held that it did not come within the provisions of the insolvent act and was not void against the trustee. [By Hinman, C. J., and Park, J. ; Butler and Carpenter, Js., dissenting.]

How far the Supreme Court can draw inferences of fact from facts found by the court below, discussed in the opposing opinions.

Where objection was made .n a foreclosure suit to the admission in evidence of the mortgage and of sundry notes claimed to be secured by it, on the ground of a variance between the notes and the description of the indebtedness in the mortgage, and it appeared that the mortgage described the debt secured as an indebtedness to two mortgagees and that the notes were payable on their face to one of the mortgagees only, it was held that there was not necessary conflict between the mortgage and the notes, and that if the allegations of the bill were such as to make the evidence applicable it was admissible, the question being one of the effect of evidence rather than of its admissibility.

BILL for the foreclosure of a mortgage executed by the respondent Beecher to the petitioners. The other respondent, Glover, was the trustee in insolvency of the estate of Beecher, and filed an answer and cross bill alleging that the mortgage was given by Beecher when in failing circumstances, with a view to insolvency and with intent to give a preference to the petitioner over his other creditors, and was therefore void as against the trustee in insolvency under the provisions of the insolvent act of 1853, and praying that the petitioners be compelled to execute to him a release of the mortgage. The following facts were found by a committee to whom the case was referred.

On the 5th of February, 1867, the respondent Beecher was indebted to Adolph Fleischhauer, one of the petitioners, in the sum of $7,761.19 for wool before that time sold to him by Fleischhauer, which indebtedness was represented by twelve notes described in a schedule annexed to the petition, all of which were signed by Beecher. These notes were *bona fide*, due, unpaid, and intended by all the parties to be secured by the mortgage hereinafter mentioned. On the 31st of December, 1866, Francis W. Bloodgood, the other petitioner, was duly appointed by the Supreme Court, in and for the County of Kings, in the state of New York, receiver of the

partnership effects of the said Fleischhauer and Henry D. Oystemere, at the suit of Oystemere, and was duly qualified to act, and did act as such receiver. On said 5th of February, 1867, at the request of the receiver, Beecher, in order to secure the payment of his indebtedness, made and delivered in the city of New York, to Bloodgood, as such receiver, and to Fleischhauer, a mortgage deed of the lands described in the petition, which deed was executed in all respects according to law, and was on the 7th day of February, 1867, recorded in the records of lands in the town of Newtown, in the state of Connecticut, in which town the lands were situated. Beecher was then indebted in the aggregate in the sum of $100,000 and more, (including the demand of the petitioners,) not secured by mortgage on his estate, and in the further sum of $9,300, which was secured by mortgage on his estate. His entire estate at that time, irrespective of the mortgages upon it, amounted only to the sum of $30,876. $10,000 or $12,000 of his indebtedness was then past due. Nearly his whole stock of materials for the manufacture which he carried on had been worked up and disposed of, and he was then working up stock of another person. Some of the notes were renewal notes, and when the mortgage was given he was deeply insolvent.

The mortgage was made by him knowing that he was then insolvent; not with the intention of stopping payment or closing his business, but to prevent interruption, and to avoid a suit and an assignment for the benefit of his creditors, in the hope that by making large profits and by some turn of good fortune he should be extricated from his embarrassments. He also gave the mortgage to the petitioners because of their urgency, and the representations made by them and their counsel that the official duty of Bloodgood required him to insist upon real estate security. But he then knew that if placed upon record the mortgage would operate as a preference to them unless assailed within sixty days after it was recorded. He did not expect that it would be immediately recorded, and believed that if recorded it would cause a pressure from other creditors which would compel him to

suspend his business and prevent his making payments. He continued his business until the 20th day of February, 1867, when he suspended business and made an assignment for the benefit of his creditors to Henry B. Glover, one of the respondents.

Bloodgood, after his appointment as receiver, was advised by his counsel in the city of New York, that a faithful discharge of the duties of his appointment required that he should collect the debt due from Beecher, or cause it to be secured by mortgage of real estate without unnecessary delay. He notified Beecher of this, and requested him to make payment, and on his not doing so insisted that he should give real estate security, and in consequence the mortgage was given. The mortgage was sought and obtained by the petitioners under this advice and for this reason, and neither of the petitioners then had knowledge of any purpose on the part of Beecher to give them a preference over his other creditors, nor of his being in failing circumstances, or insolvent, nor that he made the mortgage with a view to, or in view of, insolvency. The value of the estate mortgaged was found to be $9,500.

On the trial of the case before the committee the petitioners offered in evidence the mortgage deed, and the twelve promissory notes described in the petition. The mortgage described the indebtedness secured by it as " an indebtedness of the mortgagor to said parties of the second part [Bloodgood and Fleischhauer] in the sum of $7,761.19, secured by his promissory notes now held by them and for interest thereon." The twelve notes referred to were for various sums, amounting in the whole, besides interest, to $7,761.19, and were all signed by the mortgagor. Ten of the notes were payable to the order of Fleischhaeur and had not been endorsed by him; two were payable to the maker's own order and endorsed in blank by him. To the admission of both the mortgage and the notes in evidence the respondents objected, on the ground that the indebtedness evidenced by the notes was variant from the indebtedness described in the mortgage;

but the committee overruled the objection and admitted the evidence.

Upon these facts the case was reserved by the Superior Court for the advice of this court.

*O. S. Seymour* and *Loomis*, for the petitioners.

1.  Beecher was not in "failing circumstances" at the time the plaintiff's mortgage was made. He was not "then closing his business by an avowed and deliberate failure." *Utley* v. *Smith*, 24 Conn., 310. He was not "acting in contemplation of actually *stopping* his business because of his insolvency and utter incapacity of carrying it on." *Arnold* v. *Maynard*, 2 Story R., 358 ; *Gorham* v. *Stearns*, 1 Met., 366 ; *Jones* v. *Howland*, 8 id., 377 ; *Matter of Pearce*, 21 Verm., 625. The committee has not found the fact of Beecher's being in failing circumstances, nor the legal equivalent of it, nor indeed even evidence of it, but on the contrary the finding indicates the absence of all intention of stopping payment or closing business.

2.  The animus of the grantor and the motive with which the conveyance was made, are among the most important subjects of enquiry in these cases, and it must be proved that the conveyance was made "in view of insolvency," and with intent to make a preference and evade the statute. No such intent or motive is found to have existed, and none such can be inferred from the facts ; and in order to set aside the conveyance such motive and intent must be found. "The whole rests upon the intent with which the act is done, and the intent is to be proved as a fact." *Jones* v. *Howland*, 8 Met., 377 ; *Utley* v. *Smith*, 24 Conn., 312. In the latter case the court say :—"From the cases we derive this rule, and we think it is the true one, that the *quo animo* is the important and decisive characteristic."

3.  The mortgage was not made "in view of insolvency." The committee has not found that it was so made. Beecher did not "then contemplate bankruptcy as impending over him, and did not make the mortgage in reference to that

event and in preparation for it. " *Quinebang Bank* v. *Brewster*, 30 Conn., 562. On the contrary, he made the mortgage " to prevent interruption, to avoid a suit and assignment, and in the hope of being extricated from his embarrassments. "

4. The mortgage was not made " with the intent to make a preference among creditors. " *Utley* v *Smith*, 24 Conn., 313. These mortgagees were not friends nor relatives of the mortgagor. The motive of Beecher was not to make a preference, but his motives are found to be other than that ; he yielded to the urgency of the petitioners, and did from a sense of duty what they represented that their official duty required them to exact. The precise relation of Bloodgood to this debt is not explained by the papers, but the fact was, and sufficiently appears, that Oystemere claimed an interest in that debt, as being a partnership debt, under and in the name of Fleischhauer, but really owned by both, and under this claim Bloodgood was appointed receiver, and acted as such. The movement did not originate with Beecher ; it was entirely on the part of Bloodgood as receiver, not for preference, but to discharge his official duty. " A preference, if the result of measures taken by the creditor, or done before bankruptcy in the usual course of trade, is valid, but a preference made of his own mere motion, by and in contemplation of bankruptcy, will not be supported. " *Receivers of People's Bank,* v. *Paterson Savings Bank,* 2 Stockt. Ch., 13, 19 ; *Crosby* v. *Couch,* 11 East, 261 ; *Ogden* v. *Jackson,* 1 Johns., 372 ; *Matter of Pearce,* 21 Verm., 625 ; *Haldeman* v. *Michael,* 6 Watts & Serg., 128 ; *Hoyt* v. *Shelden,* 3 Bosw., 303 ; *Alderson* v. *Temple,* 4 Burr., 2240 ; *Mogg* v. *Baker,* 4 Mees. & Wels., 348.

5. The mortgage was *bona fide* and in the usual course of business, and protected under the 97th section of the act. The thing done was a usual and lawful matter of business. The manner of doing it was ordinary, orderly, and free from objection. The motives of the parties were the ordinary motives that lead the creditor to require security and the debtor to give it.

*Sturges*, for the respondent Glover.

1. The notes and the mortgage offered in evidence were inadmissible. The plaintiffs allege in their petition that Beecher was indebted to Fleischhauer for goods sold to him by the latter; and for that indebtedness had given to him his notes described in the schedule annexed to the petition, all of which except the last two are payable to Fleischhauer and not · endorsed. The last two notes were in terms payable to Beecher's order and by him endorsed. But it is not alleged, nor does it otherwise appear, that the title of the last two notes ever passed from Fleischhauer. They allege further that a mortgage was given to secure this indebtedness. The plaintiffs rely upon these allegations as the foundation of their suit, and to recover must prove them as laid. The mortgage introduced in evidence and objected to counts upon an indebtedness due to Bloodgood as receiver in the suit of Oystemere against Fleischhauer, and the said Fleischhauer jointly, and the committee finds that Bloodgood was receiver of the partnership effects of Oystemere and Fleischhauer. But it is not alleged in the petition, or found by the committee, that the goods sold, or the notes given for them, were ever the property of the partnership; or that Bloodgood as such receiver or otherwise, had any interest in them. On the contrary the plaintiffs allege, and the committee finds, an indebtedness to Fleischhauer only. The variance here is palpable. The notes secured by the mortgage may have been paid, or otherwise provided for by Beecher, and this may be an attempt to substitute the individual notes of Fleischhauer. A mortgage which admits of this being done, our adjudged cases with signal directness condemn. *Hart* v. *Chalker*, 14 Conn., 77; *Rood* v. *Welch*, 28 id., 157; *Boswell* v. *Goodwin*, 31 id., 81; *Dey* v. *Dunham*, 2 Johns. Ch., 182. If any debt was due to Bloodgood as receiver, it must have been a partnership debt of Oystemere & Fleischhauer. By the common law a receiver is a mere officer of the court, entitled to the custody of the property in dispute, but the title to the property does not vest in him, 2 Story Eq. Jur., § 831; 2 Daniell Cha. Prac., 1413, 1428, 1431, 1433. He cannot bring a suit

without special leave of the court. If such is the condition of Bloodgood, Oystemere had a joint interest in the debt, (as to which the mortgage is silent,) and was an indispensable party to the petition. The suit in New York, so far as the case shows, may be still pending, and in the final adjustment of the partnership affairs Oystemere may be entitled to all the assets. Story Eq. Pl., §§. 72, 73, 76 c, 201, 207. If by the law of New York the title to these notes and indebtedness described in the mortgage passed to and vested in Bloodgood, the mortgage does not secure any such indebtedness. If any equitable interest remained in Fleischhauer, Oystemere had the same interest, and no such interest is secured by the mortgage. *Porter* v. *Williams*, 5 Seld., 142.

2. This mortgage was made by Beecher in failing circumstances. He was indebted to the amount of $70,000 over and above all of his assets. Ten or twelve thousand dollars of this were then past due ; his property was encumbered by mortgage to one third of its value, besides the mortgage in question ; and all his stock of materials was worked up and sold. He gave the mortgage because pressed by the plaintiffs to give it, and to avoid a suit by them, and a consequent assignment for the benefit of his creditors. The giving of this mortgage was the only means in his power of avoiding an assignment for the benefit of his creditors for any time, and it would utterly fail to accomplish this purpose if placed on the land records, as the committee finds that Beecher well knew. The only hope he had of avoiding a total breaking up in business, was in the mortgagees withholding the deed from record, which would render it worthless, and would be in violation of the receiver's duty, to perform which was Bloodgood's main object in insisting upon its being given. Beecher was then in this condition. If he did nothing he must fail. If he complied with Bloodgood's request he must fail. And he did fail, and it was not in his power to prevent it. While the committee has not found the fact in the language of the statute, he has found it and expressed it in language equally explicit.

3. The mortgage was made with a view to insolvency.

Beecher knew he was insolvent.  He made the mortgage to avoid a suit with which he was threatened in New York, where his body was liable to arrest, if he contracted the debt knowing he was insolvent, as he did.  He gave it knowing that when put on record it would compel the suspension of his business and payments, and would operate as a preference unless assailed within sixty days.  The committee indeed finds that he did not expect that the mortgage would be immediately recorded.  But he does find that it was given because demanded as security by Bloodgood in the performance of his duty, and for that purpose.  Now Beecher either intended a preference over his other creditors, or that the mortgage should be assailed by proceedings in insolvency, for one or the other was absolutely certain to follow.  A mortgage by an insolvent debtor intended to secure a preference is void as against creditors.  And if given with the intent of having it broken up by such proceedings it is equally void.  Beecher knew it would be no security unless recorded.  As security was the object it was to be recorded, though not immediately.  But the doing of an act in view of insolvency does not necessarily mean that insolvency is contemplated as instantaneously following the act done, but as a consequence resulting in the ordinary course of events.  A day or two would be required for the transmission of the deed to the place of record, and a few days would elapse before it would be noised abroad and his creditors alarmed.  Beecher therefore intended the breaking up of his business in a very brief period, as he knew that would be the certain consequence of giving the mortgage as a security, which was the object of it, and that it would operate as a preference to the mortgagees.  Conveyances thus made are prohibited by the statute.  Consistent with this is the finding of the committee that Beecher made the conveyance to prevent the interruption of his business, that is, the immediate interruption of it; for he could not intend, and the committee does not find that he intended, to continue his business after the recording of the deed, for the committee finds that he knew that would break him up.  He therefore intended that it should.  The hope that by some turn of good fortune, while

unable to purchase materials, and indebted seventy thousand dollars beyond his resources, he should be extricated from his embarrassments, could be entertained only by a mad-man. Courts of justice are not to be influenced by such vagaries as these. The substance of the finding is that Beecher made the conveyance with a view to insolvency. But if the committee has not in terms found that fact, he has found other facts from which the Superior Court must infer the fact of contemplated insolvency. And it is competent for the Superior Court so to find ; and for this court to advise such finding by that court. *Aldred* v. *Constable,* 4 Ad. & El., N. S., 674 ; *Curtis* v. *Leavitt,* 15 N. York, 108, 111, 203 ; *Lee* v. *Kilburn,* 3 Gray, 594 ; *Everett* v. *Stone,* 3 Story, 446 ; *Winsor* v. *Kendall,* id., 507 ; *Richmondville Manufacturing Co.* v. *Prall,* 9 Conn., 494 ; James' Bankrupt Law, 158.

4. This mortgage is not protected by the provisions of section 97 of the insolvent law. That section protects a conveyance made in payment of a debt due at the time it is made, if the creditor does not know it is intended as a preference to him; and mortgages to secure debts, and endorsements arising or made at the time such mortgage is given, provided it is not given to aid the debtor in giving preferences to a part of his creditors. But a mortgage given to secure a past debt by one in failing circumstances with a view to insolvency is void under the first section, although the mortgagee may be ignorant of the mortgagor's circumstances, and of his intent in securing a preference. *Hildreth* v. *Sands,* 2 Johns. Ch., 35 ; *Peckham* v. *Burrows,* 3 Story, 544.

5. The deed is void on its face as given to delay and defraud creditors, both at common law, and under our statute against fraudulent conveyances, as well as by our insolvent law. Although the phraseology of our statute against fraudulent conveyances is somewhat different from that of New York, and those of other states, yet they are all supposed to embody the provisions of the statute of the 13th of Elizabeth on this subject. That statute in terms declares conveyances void which are made with intent to hinder or delay creditors. And such are the terms of the New York

statute.   This deed conveys the legal title to the land, and contains a power of sale, under which the mortgagees may sell at any time, and after.paying their own debt, hold the surplus for the mortgagor.   Such mortgages are unknown to our practice.   2 Swift Dig., 164.   If this power is held valid, it places the property beyond the reach of Beecher's creditors.   No attachment could arrest it.   A sale under it would pass a perfect title ; and the creditors would be driven to the necessity of following the avails into another jurisdiction, where they would be subjected to other laws. By the insolvent law of 1828 such a conveyance would be void.   It was not the intention of the present insolvent law to repeal the provisions of that on this subject, but to extend it so as to embrace other conveyances, for the purpose of making a more equal distribution of the property of insolvent debtors among their creditors.   1   Washb.   Real   Prop., 498 ;  2 Parsons  on Cont., 641 ;  *Harris*  v.  *Sumner*, 2  Pick., 129, 135 ;  *Goodrich* v.  *Downs*, 6 Hill, 438 ;  *Barney* v.  *Griffin*, 2 Comst., 365 ;  *Pettibone* v.  *Stevens*, 15 Conn., 19 ;  *Riggs* v. *Murray*, 2 Johns. Ch., 565 ;  *Lawrence* v.  *Farmer's Loan &amp; Trust  Co.*, 3 Kern., 200 ;  *Leitch*  v.  *Hollister*, 4  Comst., 211 ;  *Smith*  v.   *Cannon*,  2  El. &amp; Blackb., 35 ;  *French* v. *French*, 39 Eng.  Law  &amp;  Eq. R.,  85 ;  *Sampson* v.  *Pattison*, 1 Hare, 533.

PARK, J.   The principal questions in this case arise from the following paragraph in the report of the committee :—

" Said  mortgage was made by the respondent, Beecher, knowing that he was then insolvent ; not with the intention of stopping payment or closing his business, but to prevent interruption, and to avoid a suit and an assignment for the benefit of his creditors, in the hope, on his part, that by making large profits and by some turn of good fortune he should be extricated from his embarrassments.   He also gave said mortgage to the petitioners because of their urgency, and the representations made by them and their counsel that the official duty of said Bloodgood required him to insist upon security of real estate.   But the said Beecher then knew that, if

placed upon record, it would operate as a preference to them unless assailed within sixty days after it should be recorded. He did not expect that the mortgage would be immediately recorded, and believed that if recorded it would cause a pressure from other creditors which would compel him to suspend his business and prevent his making payments. He continued his business and did not abandon the same till the 20th day of February, 1867, when he suspended business and made an assignment for the benefit of his creditors to Henry B. Glover, one of the respondents."

In the late case of *Utley* v. *Smith*, 24 Conn., 290, the court say :—" Three things are necessary in order to make the deed of an insolvent debtor fraudulent and void under the statute of 1853. First, the grantor must be in failing circumstances; second, the deed must be made with a view to insolvency; and third, the deed must be made with intent to prefer one creditor to another." In regard to the second and third of these essential elements, the court, after reviewing the American and late English authorities upon the subject say, " We derive this rule, and we think it is the true one, that the *quo animo* is the important and decisive characteristic," and hold that the *quo animo* must be proved to exist as a fact, and cannot be inferred, or presumed to exist, by inference of law contrary to the fact.

In the more recent case of *Quinebaug Bank* v. *Brewster*, 30 Conn., 559, the court say, that a question of intent is always a question of fact, and that the rule that a man is presumed to have intended the probable consequences of his own acts, is merely a rule of evidence, to be applied by the triers in determining the *quo animo*.

The same doctrine is held in other cases. *Arnold* v. *Maynard*, 2 Story R., 358; *Matter of Pearce*, 21 Verm., 611; *Gorham* v. *Stearns*, 1 Met., 366; *Jones* v. *Howland*, 8 id., 377.

Now, was this mortgage made with a view to insolvency? The finding on this subject is as follows: " Said mortgage was made by him knowing that he was then insolvent, not with the intention of stopping payment or closing his business, but to prevent interruption, and to avoid a suit and an

Bloodgood *v.* Beecher.

assignment for the benefit of his creditors, in the hope on his part that by making large profits and by some turn of good fortune he should be extricated from his embarrassments." There is no finding here that the mortgage was made with a view to insolvency, as the cases cited require, and how can this court find the fact? There is no evidence even, tending to show the fact, except that Beecher knew that he was then insolvent. But it is obvious that insolvency known to a party is not enough, as matter of law, to bring a case within the purview of the statute, for insolvency is there qualified by the phrases, "failing circumstances," and "with a view to insolvency," and having an "intent to prefer one creditor to another." These terms are important, and show clearly what class of conveyances made by an insolvent were intended to be reached by the statute. It is well known that prior to the passage of this act the last transactions of an insolvent, when on the eve of making a general assignment for the benefit of his creditors, consisted in executing conveyances to preferred creditors, who were generally relatives of the insolvent, and took all his property. The statute is aimed at such conveyances as these and others of a like character, although made somewhat more remotely with a view to insolvency. But this question has been directly decided. Judge Ellsworth, in *Utley* v. *Smith* before referred to, says, " Actual insolvency is not enough, for this does not necessarily prove any particular view of the insolvent in an ordinary sale or mortgage; his insolvency may have nothing at all to do with it, and be neither the cause nor the occasion of it. It is but a circumstance to be taken into the account in weighing motives." In *Quinebaug Bank* v. *Brewster*, before cited, Judge Sanford says, " Now, had it been shown that Rose actually knew or supposed himself unable to pay all his debts and consequently that actual insolvency impended over him, that fact would have authorized an inference to be taken into the account and weighed by the triers in determining the question whether he made the mortgage with an intention to evade the operation of the statute and prefer the mortgagee or not. Even

then, however, no conclusive inference or presumption of such intention could have been made. It would still have been a question of fact to be determined upon all of the evidence." In *Jones* v. *Howland*, supra, Judge Hubbard says :—" If a party who fears or believes himself insolvent, but does not contemplate stoppage or failure and intends to keep on and make his payments and transact his business, hoping that his affairs may be thereafter retrieved, and in that state of mind makes a sale or payment without intending to give a preference, and as a measure connected with going on with his business, and not as a measure preparatory to or connected with a stoppage in business, such sale or payment is not void as made in contemplation of bankruptcy." The facts of that case as stated by Judge Hubbard are substantially the facts found here.

These cases decide that the question whether a conveyance was made with a view to insolvency is one of fact; and that insolvency known to a party making a conveyance is only evidence to be considered by the triers in determining the *quo animo.* Now this court has repeatedly held that it cannot find facts from evidence reported to it, and for this reason a majority of the court are unable to discover how this conveyance can be regarded as fraudulent and void under the statute of 1853.

Again, the committee has not only not found that this mortgage was made with a view to insolvency, but on the contrary has substantially found that it was not so made. The finding states that the mortgage was not made " with the intention of stopping payment or closing his business." This substantially negates its being done with a view to insolvency, for stopping payment and closing business would be insolvency in a person in Beecher's condition. In *Utley* v. *Smith* the court say :—" 'Failing circumstances' seems to imply that the insolvent is about failing and closing his affairs, knowing his inability to continue in business and meet his payments." Now if a person is in failing circumstances when in the condition described by the court, he certainly has failed when those events transpire. The finding says that Beecher did

not make the mortgage with the intention of stopping his payments or closing his business. He then did not make it with a view to insolvency. This alone would seem to be conclusive of the case.

But, again, the finding is that the mortgage was made to prevent interruption, and to avoid a suit and an assignment for the benefit of his creditors. So far as any purpose or object is shown to have existed in the mind of Beecher moving him to make the mortgage this is all. He knew that he was then insolvent, but he saw his way out of his embarrassments if he could be permitted to go on with his business for a time. The petitioners were urgent to be secured. They and their counsel represented that the official duty of Bloodgood required him to obtain security. Beecher feared that he would be broken up in business unless he complied, and the hope he entertained of extricating himself from his embarrassments induced him to do it for the reasons stated. Whether that hope was a well grounded or vain one is of no importance. Neither is it of any importance how other men would have regarded his financial affairs at that time. The question is, how did Beecher himself look upon his condition, and what motive had he in making the conveyance? All the motive shown is in conflict with the claim of the respondents. A conveyance made with a view to insolvency has in contemplation a closing of the affairs of the insolvent. This conveyance was made to enable Beecher, in his opinion, to go on with his business.

A conveyance made with a view to insolvency is a part, at east, of the preparation made for that event, as a man realizing that death is at hand prepares his will. This conveyance was made as a sick man takes medicine to prolong his life. Was this conveyance made to keep this property from the general fund of creditors, and to prefer the petitioners to the other creditors of the mortgagor? Who can read this finding and believe that, had Beecher known on the 5th day of February, 1867, when this conveyance was made, that all his hopes of continuing business were vain, and that he would be compelled to make an assignment for the benefit of

all his creditors within fifteen days, this conveyance would ever have been made? The finding represents Beecher as exceedingly loth to make it. The petitioners had to be earnest in their demands to be secured. The official duty of Bloodgood had to be urged by them and their counsel. The fears of Beecher had to be excited that he would be broken up in business and compelled to go into insolvency unless he complied. And above all, the hope of Beecher that he could extricate himself from his embarrassed condition, could he be permitted to go on in business, had to operate upon his mind before he could be induced to do it.

This question is intimately connected with the one we have considered, and much that has been said in regard to that has an important bearing upon this. Here, as there, the case has to do with the mind of Beecher in making the conveyance, and we are to inquire with what intent it was done. Here, as there, the committee has left the question of fact undecided and given us evidence bearing upon both sides of it. The respondents rely upon the following finding, taken in connection with the fact that Beecher knew that he was then insolvent. "But Beecher then knew that if the mortgage was placed upon record it would operate as a preference to them unless assailed within sixty days after it should be recorded. He did not expect that the mortgage would be immediately recorded, and believed that, if recorded, it would cause a pressure from other creditors which would compel him to suspend his business and prevent his making payments." It is true that this is evidence tending to show that the mortgage was made with intent to prefer the petitioners to the other creditors of the mortgagor; but is it conclusive upon the subject, so that it can be said as matter of law, to be applied not only in this case but in all others where like facts appear, that such was the intention? It must be conceded that there was no active intent in the mind of Beecher to prefer the petitioners; and no intent, unless his assent to make the mortgage can be so construed, which was forced from him by pressure of circumstances. Beecher felt himself in the condition of one about to be ruined unless he

executed the mortgage. He had no desire to favor the petitioners. There was no reason why he should. Bloodgood was a stranger to him. The most that can be said is, that he assented to execute the mortgage, knowing that it would operate as a preference should certain events happen. But is this sufficient, when it clearly appears that there was no intent in fact to prefer the petitioners? Assent is the cold act of the understanding. An intent to prefer is the warm act of the affections. They have but little in common. This finding is drawn with great care, and shows a design to exclude from the case all intent in fact to prefer the petitioners; so much so that the words "would operate as a preference" are guardedly used; and unless the respondents can show an intent in law to prefer the petitioners, arising from these facts, and contrary to the truth, they derive no benefit from this finding.

The cases referred to, and many more that might be cited, make this question depend upon the *quo animo* in fact, and if any case can be found where a contrary doctrine has been held, it has escaped our notice.

Again, it is not found that Beecher knew that the law required that the mortgage should be recorded; and if he did not know the fact then there is no foundation for the claim of the respondents, for their claim involves the necessity of such knowledge; but it seems from what is found on the subject that he did not know that it was necessary; for it is stated that he did not expect that it would be recorded immediately, and that he hoped to extricate himself from his embarrassments by making large profits thereafter in his business, and further, that he gave the mortgage to prevent interruption, and to avoid a suit and an assignment for the benefit of his creditors. How could these things be if he knew that the mortgage in all probability would be recorded in a few days, and that insolvency would follow? He made the mortgage "to prevent interruption," and "to avoid an assignment." But the respondents say that he gave it knowing it would bring interruption and would cause an assignment. This seems to me absurd. Whatever other men

might have thought in like circumstances with Beecher, it is clear that he was anxious to go on with his business, and expected to do so should he give the mortgage, and gave it for that purpose only. This is the sole object that he is found by the committee to have had in view, and if so, then it follows conclusively that this mortgage was not made with intent to prefer the petitioners to the other creditors of the mortgagor, for ·it is utterly inconsistent with these facts that he could have had such intent. We must take the facts as they are. It is not for us to say how we should have found them if we ·had been the triers. They have been found, and our duty is to apply the law to the facts as they appear.

On the trial before the committee the respondents objected to the admission of the mortgage and notes in evidence, on the ground of a variance between them. The claim was, that a mortgage and the debt secured by it are so connected together, and each dependent upon the other to lay the foundation for a decree of foreclosure, that neither without the other can be admissible in ˚evidence ; and that therefore a substantial variance between two such items of evidence will render each inadmissible, because it shows that the debt offered in evidence was not the debt secured by the mortgage. However valid the objection may have been if the facts of the case had supported the claim, it is clear that there was no necessary conflict between the mortgage and the notes offered in evidence in this case. The mortgage description of the debt secured by it, is " an indebtedness to Bloodgood as receiver, and to Fleischhauer, in the sum of seven thousand, seven hundred sixty-one dollars and nineteen cents secured by certain promissory notes of the mortgagor now held by them. " The notes are not otherwise described, and it is manifest that this description does not necessarily conflict with the notes offered in evidence, unless it be in the amount of the indebtedness, a small error in which the petition lays the foundation for correcting. It does not necessarily follow that these notes were the individual property of Fleischhauer because they appear to be so upon their face. They may have been partnership property notwithstanding, as the

petitioners claim. Whether evidence tending to show such fact could be received under the allegations of the petition is another question. If objection had been made upon that ground, it would have. been made to the evidence tending to show such fact, and then the petitioners might have amended their petition; but the objection that was made is clearly untenable.

Again, the petition sets forth that the notes offered in evidence are the identical notes secured by the mortgage, and it makes them a part of the petition. It further sets forth the mortgage, and makes that also a part of the petition. To prove these allegations the mortgage and notes were offered in evidence. They were clearly admissible for that purpose, and whatever claim could have been made to a disagreement between the mortgage and the notes, should have been mad to the effect of the evidence, and not as an objection to its admissibility.

A majority of the court therefore advise the Superior Court to accept the report of the committee, and grant the prayer of the petitioner.

In this opinion HINMAN, C. J., concurred.

CARPENTER J. (Dissenting.) I do not deem it necessary to consider the question whether this conveyance is protected by the 97th section of the statute relating to the settlement of estates. The opinion of the majority proceeds upon the idea, not that the mortgage was received in good faith, but that it was given in good faith. The motives and pur_poses of Beecher alone seem to be important, and the case is treated as though the 87th section of the act only was applicable to it. That section invalidates a conveyance if made by a party " in failing circumstances, with a view to insolvency."

The proposition which I shall attempt to maintain is this,— that this mortgage cannot be sustained, so far as its validity is made to depend upon the motives and intention of the mortgagor.

According to the case of *Utley* v. *Smith*, 24 Conn., 290, three things are essential to my purpose. 1. That the mortgagor was in failing circumstances. 2. That the mortgage was made with a view to insolvency. ·3. That it was made with intent to prefer certain creditors.

Before proceeding to examine separately the several questions thus raised, I wish to call attention to the nature and design of the statute. It is not in the nature of a penal statute, to be construed strictly, but on the contrary is in the nature of a statute for the prevention of fraud and injustice, and ought to be liberally and beneficially expounded; and must be so expounded in order that it may accomplish the object intended by the legislature. Hence, if the case is fairly within the spirit of the act, it ought to be governed by it, whether it is strictly within its letter or not; at least, its efficacy ought not to be impaired by a narrow and technical interpretation of the language used. Its design is not to punish either party to a conveyance by way of a penalty or forfeiture, but to effect an equal and just distribution of the insolvent's effects, *pro rata*, among all his creditors. Now it cannot be denied that sustaining this conveyance defeats the object of the statute, and exposes the creditors of this estate to all the mischiefs intended to be avoided by the legislature.

Keeping these suggestions in view let us examine carefully the case before us.

1. It is not denied that the mortgagor was in failing circumstances. He was deeply insolvent. Many of his debts were past due, his creditors were pressing, and his affairs were so critical that an attachment or a mortgage put on record was sure to be followed by proceedings in insolvency.

2. Was this mortgage made with a view to insolvency? It becomes important to understand precisely what this expression means. I apprehend that it does not necessarily mean, as the opinion of the majority seems to suppose, an intention on the part of the mortgagor that the mortgage should be followed up by an assignment, or other proceedings in insolvency. If that, and that alone, is the meaning, then the fact

found by the committee, that the mortgage was made, "not with the intention of stopping payment or closing his business, but to prevent interruption, and to avoid a suit and an assignment for the benefit of his creditors, &c," would control the decision. But if the expression means, as I think it does, much more than this, then this part of the finding should have but little weight in determining this question. This expression is equivalent, in its legal significance, to the expression found in the English and American bankrupt acts, "in contemplation of bankruptcy," and should receive the same interpretation. That expression cannot refer solely, nor principally, to voluntary bankruptcy, for such a thing is hardly known to the English statutes where it originated. That it is not limited to cases where the bankrupt intended to have proceedings instituted against him, is apparent from the decisions. In *Fidgeon* v. *Sharpe*, 5 Taunt., 539, Lord Chief Justice Gibbs says, "With respect to this doctrine of contemplation in cases of bankruptcy, we have nothing, either in the common or statute law, to show what it is. The cases in which this doctrine was introduced make it depend upon the *quo animo ; if a trader thought he should not have enough to pay all his creditors, it must be presumed that, if he gives full payment to one, he does it in contemplation of bankruptcy.*" In *Arnold* v. *Maynard*, 2 Story R., 357, Judge Story, after reviewing the English decisions on this subject, says, "I should deduce the general conclusion from the English cases to be, that a conveyance by a person, knowing himself to be insolvent, to one creditor, with a design of giving him a preference over the other creditors, in the event of his own expected bankruptcy and stoppage of business, was of itself an act of bankruptcy, as a fraud upon the bankrupt laws." And again, on page 353-4, "If the question meant to be asked was, whether, if the mortgagor, at the time of executing the mortgage, knowing his own insolvency and inability further to carry on his business, but having no immediate intention on his part to seek by petition the benefit of the bankrupt act, or thereby to enable his other creditors to proceed against him *in invitum*, to have him declared a bank-

rupt under that act, but actually designing and intending thereby to give a preference to the mortgagee over all his other creditors, it was such a security, conveyance or transfer as was fraudulent and in contemplation of bankruptcy within the meaning of the bankrupt act, then I say, *that his mere private intention cannot overcome the legal intention and purport of the act*; and it is to be treated, in the sense of the statute, as made in contemplation of bankruptcy, although it was not done by him with the intention of being declared a bankrupt.  When the statute speaks of a conveyance or transfer in contemplation of bankruptcy, it does not necessarily mean, in contemplation of being declared a bankrupt under the statute, but in contemplation of actually stopping his business because he is insolvent and utterly incapable of carrying it on. "

My investigation of this subject has satisfied me that the construction now virtually given to this statute by the majority is altogether too narrow.  The language used, the nature of the case, the object of the statute, all the circumstances, combine to show that it cannot depend entirely upon the wishes or intention of the party.  The act of mortgaging may be under such circumstances as to have a " legal intention and purport, " which cannot be controlled by the mere private intention of the mortgagor.  Hence, if a party intends, expects or fears insolvency as an impending event, and, influenced by such intention, expectation or fear, makes a conveyance or transfer of his property, or pays a debt, with a design to prefer one creditor to another, he does the act with a view to insolvency within the meaning of the statute.  The fact that he does so with the hope that insolvency will thereby be postponed, or entirely prevented, will make no difference, provided insolvency follows, and a preference of creditors is the result ; for it is to be borne in mind that the object aimed at is to avoid a preference and secure an equal distribution among creditors. .

The question now returns, was this mortgage made with a view to insolvency ?  He was so badly insolvent, that his estate in any event would pay less than thirty cents on the dol-

lar. With all the property at his command he had nearly ceased working his own stock of materials, and was working the stock of another. · To secure this debt required one quarter of his entire property, and one third of his property after paying prior incumbrances, which still further embarrassed him by materially reducing the means at his command. Other debts were then due, and he was fully aware of his situation. But this is not all ; for he knew that insolvency was sure to follow the mortgage as a consequence thereof. It is expressly found that he " then knew that if placed upon record it would operate as a preference to them unless assailed within sixty days after it should be recorded. "

It is true he did not expect that it would be immediately recorded, but there was no agreement to that effect, and no facts found that would justify such an expectation. He must have known that the law required it to be recorded, and therefore must have known that it would have been done in the ordinary course of business, in the absence of any arrangement to the contrary, and that it must very soon result in breaking up his business. He was in this dilemma ; a suit by attachment, with which he was threatened, would break him up and precipitate insolvency ; a mortgage would in all probability have the same result, but there was a possibility that it might be postponed for a while, and that in the meantime large profits or some unexpected turn of fortune would extricate him from his embarrassment. He was forced to submit to the one or the other. He chose the latter, as a means of preventing immediate insolvency. He intended thereby to prevent interruption by a suit, and an assignment as a necessary consequence, but with a moral certainty that the mortgage would have the same result after a brief interval.

I cannot assent to the proposition that this was done for the purpose of *continuing* his business, within the meaning of *Utley* v. *Smith,* and other cases cited. On the contrary it is quite clear to me that it was done with a view to insolvency. He feared and expected insolvency ; and that fear and expectation entered into and formed a part of the act of mortgag-

ing. His critical situation, financially, was both the cause and occasion of the mortgage, and it was so understood by him. The act, therefore, had a "legal intention and purport," which ought to stand, notwithstanding his hopes and wishes to the contrary.

I am not troubled with the suggestion that this is a question of fact, and that the committee has not found, in terms, that this was done with a view to insolvency. All the facts which characterize the transaction, and which are necessary to show that it is within the statute, have been found, and it only remains for the court to apply the law. There is nothing, as it seems to me, in the case of *Utley* v. *Smith,* inconsistent with this view. There, the only fact found was, that the mortgagor was insolvent; and the court was asked to infer, as matter of law, from that naked fact, that the mortgage was within the statute. The court very properly held that it could not be done. Here, many other facts are before us, and I see no legal difficulty in disposing of the case. But my views on this point are more fully stated under the next head, and I will not enlarge.

3. The third and last question is, did the mortgagor intend to prefer the mortgagee to his other creditors?

This is purely a question of intention. In this respect it differs somewhat from the question just considered.

In relation to this question, the majority say, "The committee has left the question of fact undecided, and given us evidence bearing upon both sides of the case." If this be so the duty of this court is manifest. A case of this importance ought not to be determined and finally disposed of, with an important and material question of fact undecided. The case is reserved for our advice. In such cases the usual course is, to remand it for a further finding of facts. Instead of doing so, a majority of the court, inconsistently as it seems to me, proceeds to determine the question by finding, *as a fact,* that he did not intend to prefer creditors; notwithstanding the effect of such finding will be to defeat the operation of one of the most important acts upon our statute book, the wisdom and propriety of which is questioned by no one.

This seems the more extraordinary, inasmuch as the corner stone of the decision is, that it is not competent for this court to draw an inference of fact.

But this is not all. Prominence is given in this part of the case to the fact that the committee has not found that the mortgagor knew of the law requiring mortgages to be recorded. It is then assumed that he was ignorant of it. This assumption rests on no other foundation than an *inference of fact,* drawn from the finding of the committee that Beecher " did not expect that the mortgage would be immediately recorded." It is to be presumed that Beecher knew the law. But without this presumption, there is hardly room for the inference that a business man, of ordinary intelligence, was ignorant of the plain requirements of a law so universally known.

The opinion of the majority further says: " Now this court has repeatedly held that it cannot find facts from evidence reported to it, and for this reason a majority of the court are unable to discover how this conveyance can be regarded as fraudulent and void under the statute of 1853." I am not aware of any such decision. No authorities are cited, nor do I believe that the proposition as applicable to a case like this has ever before been promulgated as law. There is a class of cases, of which this is one, involving questions of fraud, intention and the like, in which the main fact is not susceptible of direct proof, but can only be proved by way of inference from other facts. In these cases, when the other facts appear, this court has repeatedly drawn the inference. This was done in the case of *Corbin* v. *The Amer ican Mills,* 27 Conn., 278, also in *Dimock* v. *Town of Suffield,* 30 Conn., 129, and in many other cases which might be cited. That the court has the power to draw inferences of fact in such cases I cannot entertain a doubt. It may not always be advisable to exercise this power. When however a case has been argued upon its merits, and justice requires it, we ought not to hesitate. At all events it is unwise to deny ourselves the power to do so. The cases of *Utley* v. *Smith,* and *Quinebaug Bank* v. *Brewster,* are not in conflict with

this view.   In each of these cases the gist of the decision, when carefully examined, will be found to be, that there were not facts enough found to enable the courts to draw the conclusion claimed.

But in this case I think sufficient facts are found to enable us to come to a right conclusion.  The facts referred to under the preceding head must be borne in mind, as important to be considered also in this connection.  Moreover, it is expressly found that " Beecher then knew that if placed upon record the mortgage would operate as a preference to them, unless assailed within sixty days after it should be recorded."  That he must have known that it would be recorded I have already shown.   The conclusion then is inevitable, that he knew the mortgage would operate as a preference, or be invalidated by proceedings in insolvency.   In either event, the intention in a legal point of view *exists.*   It will hardly do to say that a sane man can do an act which must inevitably have but one result, without intending that result.

I cannot avoid, in this connection, calling particular attention to one paragraph in my brother Park's opinion.   "Whatever other men might have thought in like circumstances with Beecher, it is clear that he was anxious to go on with his business, and expected to do so should he give the mortgage, and gave it for that purpose only.  This is the sole object found by the committee that he had in view, and if so, then it follows conclusively that this mortgage was not made with intent to prefer the petitioners to the other creditors of the mortgagor, for it is utterly inconsistent with these facts that he could have had such intent."   Thus Beecher is made to do an act, intending only a remote, and, under the circumstances, a very improbable consequence of the act; and the court is called upon to say, and a majority do say, that having this object in view he could have no other, and therefore that he did not intend that this deed should operate to prefer creditors.   I cannot assent to this process of reasoning.   The object of a mortgage is security.   A man may be induced to gave security against his will even, hoping thereby to derive some incidental advantage.   That is precisely the case before

us. Beecher intentionally gave security, as a means of postponing, for a short time, proceedings in insolvency. The argument that such a hope, whether well or ill founded, excludes from the mind of the mortgagor all intention of giving security is incomprehensible to me. He intended then to give security. If he intended that, then he intended a preference, as the deed, under the circumstances, could not secure the debt without preferring the creditors.

In conclusion I desire to say, that I have examined with some care the English and American decisions bearing upon this subject, and I believe that no case can be found which amounts so nearly to a judicial repeal of the statute as the present. The importance of this question, and the effect which the decision is likely to have upon the business interests of the state, have constrained me to give at length my reasons for dissenting from the views expressed by the majority.

In this opinion BUTLER, J., concurred.