Memorandum of Decision
On May 21, 1998, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Jaime P. and Terri M. to Marcus M, a minor boy. On August 31, 1999, DCF filed a revised termination petition substituting Matthew M. for Jaime P. as the father.[2] On November 22, 1999, Matthew M. consented to the termination of his parental rights. On November 22, 23, 24, and 29, 1999, trial of the termination petition against the mother, Terri M., took place in this court. For the reasons stated below, the court now grants the termination petition in its entirety.
FACTS
The court finds the following facts and credits the following evidence.
A. The Mother
Marcus was born on November 2, 1994. His birth certificate contains no name for a father. The mother initially named two other men as the father before naming Matthew M. The mother, who is now almost twenty-three, comes from a dysfunctional family with a history of substance abuse, domestic violence, and criminal activity. DCF first became involved in the case in January, 1997 due to reports of substance abuse and poor parenting by the mother. DCF referred the mother to drug treatment and parenting classes, and arranged for a parent aide, but the mother never followed through.
On August 6, 1997, DCF and the mother entered into a service agreement that called for DCF to provide appropriate services to the mother and Marcus and for the mother to cooperate fully with DCF. The mother continued to be noncompliant with the recommended services. The mother was essentially homeless, living with Marcus at relatives' homes, a hotel, and a friend's house. Contrary to the service agreement, the mother left Marcus in the care of her maternal aunt, who was ill, and who had a substance abuse history and an extensive criminal record. The mother also broke a verbal commitment to cease living with a boyfriend she identified as Michael W., who, according to the maternal aunt, was dealing drugs.
On September 5, 1997, local police arrested the mother and the boyfriend, whose real name was Michael H. The police had CT Page 16276 conducted a controlled drug buy at the premises from Michael H. and later found the mother in possession of the currency. Police found drugs, a number of firearms, a knife, and several whiskey bottles in the room where Marcus slept and within his probable reach. DCF removed Marcus and obtained an order of temporary custody. Michael H., who had a history of four prior felony convictions, three misdemeanors, a violation of probation, and pending felony charges, was convicted of sale of narcotics and sentenced to fifteen years in prison, suspended after five.
The mother went to jail at the time of her arrest and the court imposed a protective order preventing her from having any contact with Marcus. During the next two months, the mother failed to inquire of DCF about Marcus's well-being. She denied using cocaine, although she admitted prior marijuana use. After a drug test revealed that she had used cocaine in August, 1997, the mother admitted handling her boyfriend's drug inventory but maintained that she did not ingest any cocaine.[3] After spending two months in jail, the mother was convicted of risk of injury to a minor and given a suspended sentence and probation.
The court adjudicated Marcus neglected on November 17, 1997 and set expectations for the mother to meet. Beginning in February, 1998, the DCF case worker sent the mother a series of approximately twenty-eight letters, and made additional phone calls, reminding the mother of her obligations and appointments and offering the mother transportation, and other assistance. The letters reveal the continued willingness of the case worker to work with the mother and the mother's regular failure to contact the case worker.[4]
The expectations called for the mother to obtain individual, substance abuse, parenting, and domestic violence counseling. The mother initially agreed with the recommendation of individual counseling because of stress that she was experiencing. She attended an initial evaluation in December, 1977, and was referred to a psychiatrist. In January, 1988, after missing several appointments, the mother met with the psychiatrist, who recommended time-limited psychotherapy. The mother did not follow through. As of September, 1998, the mother still had not completed individual counseling.[5]
The mother was inconsistent in attending substance abuse counseling from December, 1997 to February, 1998. Her drug tests during this period were negative. After the mother moved to CT Page 16277 another town in February, 1998, DCF referred her to another substance abuse treatment center. Initially, the mother claimed she had never used cocaine and did not see the removal of Marcus from her home as a consequence of drug use. She also stated that she would continue a relationship with Michael H. if DCF would allow it. The mother failed to continue with drug treatment meetings during the spring of 1998. She eventually completed them in October, 1998 and her drug tests remained negative. The mother completed parenting classes in late 1998 or early 1999, but failed to comply with the expectation that she obtain domestic violence counseling.
The court lifted the protective order against the mother in December, 1997. The mother did not request visits with Marcus until February, 1998. The mother failed to keep her attorney informed of her whereabouts during this time period. Between February and June, 1998, the mother attended seven out of eleven scheduled visits with Marcus. Between September, 1997 and June, 1998, the mother failed to provide DCF with any gifts or correspondence to give to Marcus. The mother has generally failed to inquire of DCF concerning Marcus's well-being in his foster home.
Visits have generally taken place on a weekly basis through the present time. The mother canceled approximately fifteen visits and was late for four or five others. During the better weather, the first half of the visit would occur at a park. There Marcus ran around, and one occasion started to wander off, while the mother remained seated at a picnic table, watching Marcus but not following him. During the second half of the visit, and during the visits that took place entirely indoors, Marcus would sit on the mother's lap while she read him a book. Marcus was comfortable with his mother and called her "Mom." The mother was appropriate with Marcus and displayed affection for him, especially at the end of the visit.
On February 14, 1998, the mother gave birth to a boy named Michael, who is named after his father, Michael H. The mother missed three critical medical appointments for Michael. She brought him in on her own to a hospital emergency room and then a hospital clinic, both of which diagnosed Michael with the condition of failure to thrive. The cause of this condition was the baby's lack of caloric intake or, essentially, starvation.[6] Michael was admitted to the hospital and DCF took temporary custody of him. DCF eventually filed for CT Page 16278 termination of parental rights. At the time of trial, the termination trial had taken place in a different juvenile court but the court had not yet issued a decision.
Over the course of this case, the mother has not maintained adequate income and housing. She has not held a steady job and, having dropped out of ninth grade, has no apparent job skills. She has lost financial benefits from several state programs due to noncompliance with their policy or failure to request reinstatement. She has lived transiently. The mother was not present for two scheduled home visits by DCF, evaded an unannounced home visit by her probation officer in August, 1998, and failed to keep a scheduled home visit with the officer in September, 1998. For at least the first nine months in 1999, the mother lived with a boyfriend, who apparently is the father of her third child, Xavier. A probation officer who visited the mother and her boyfriend in January, 1999, found the residence to be filthy and a fire hazard. Xavier is currently living with relatives. At the time of trial, the mother was pregnant with her fourth child.
The mother failed to appear for two scheduled appointments in June and August, 1998 with the court-appointed evaluator, Dr. David Mantell. The mother did appear for evaluations in October and November, 1999. Dr. Mantell found that the mother had no major mental illness. He did find, and confirmed in court, that the mother and Marcus have more of a visiting relationship than a parent-child bond, and that there was an absence of physical affection by the mother toward Marcus. Dr. Mantell observed, and other witnesses confirmed, that the mother has never acknowledged responsibility for neglecting Marcus or a need for any services. Dr. Mantell also felt that DCF's removal of Michael from her care was significant in showing the mother's pattern of making poor partner choices and failing to comply with treatment schedules.
B. Marcus
Marcus has remained in foster care since his removal in September, 1997. After several temporary placements, Marcus went to a foster home where he stayed until August, 1998. During this time, two assessments of Marcus established global developmental delays. The latter evaluation, conducted in February, 1998, revealed that Marcus, then over three years old, did not even respond to his name. Marcus did not know how to interact with other persons. The probable reason for this and other significant CT Page 16279 communication delays that Marcus was experiencing was lack of parental stimulation. The evaluators recommended that Marcus obtain special education services and speech therapy.
Marcus entered the foster home of Cathy S. in August, 1998. At first, Marcus did not make eye contact, did not speak well, and engaged in tantrums and behaviors such as humming, banging, and rocking back and forth. He would not fully hug his foster mother.
As a speech pathologist testified, the situation now compared to before is like night and day. As of the end of the last school year, Marcus was interacting well with other students. The probable explanation for the improvement is parental involvement and special services.
At home with Cathy S., Marcus now can express himself well, maintain his concentration, and give affectionate hugs. He likes his daily routine. He calls the foster mother "Mommy," tells her he loves her, and is concerned when she leaves him.
Cathy S., who is an elementary school teacher herself has kept in touch with Marcus's teachers and has arranged for additional speech services outside of the school system. She has a very close bond to Marcus and has a strong desire to adopt him. Cathy S. is willing to work with Terri M. on a visitation schedule because she believe that Marcus needs to know his natural mother.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes (Rev. to 1997) § 17a-112
(c)(1).[7] "Reasonable efforts means doing everything reasonable, not everything possible." In re Jessica B.,50 Conn. App. 554, 566, 718 A.2d 997 (1998).
In this case, the evidence is clear and convincing that DCF did make reasonable efforts to locate the mother and reunite her CT Page 16280 with Marcus. DCF referred the mother to substance abuse programs, psychiatric and psychological evaluations, parenting classes, a women's group, individual counseling, anger management classes, a parent aid, domestic violence counseling, and the Department of Social Services for state aid. DCF also provided the mother regular visitation with Marcus while he was in foster care and transportation assistance.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael R., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes (Rev. to 1997) § 17a-112 (c)(3). Section 17a-112 (c)(3) of the General Statutes (Rev. to 1997) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in § 17a-112
(d). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
The substituted petition filed on August 31, 1999 did not amend the allegations concerning the mother in the original May 21, 1998 petition and thus the adjudicatory date in this case is May 21, 1998. DCF has alleged the ground of failure to rehabilitate against the mother. The court finds that DCF has proven this ground by clear and convincing evidence.
The ground of failure to rehabilitate arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes (Rev. to 1997) § 17a-112 (c)(3)(B). No dispute exists that the court adjudicated Marcus neglected on November 17, 1997, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, CT Page 16281 considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes (Rev. to 1997) § 17a-112 (c)(3)(B). The statute requires the court to analyze the parent's rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). The statute, however, does not require a parent to "be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463,477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259
(1984). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parent's conduct before the filing of the termination petition, but also the conduct occurring after it.
From the beginning of DCF involvement in this case in January, 1997, until the adjudication of neglect, the mother did not take advantage of the services recommended by DCF and did not honor the service agreement that she pledged to keep. Her use of cocaine in the summer of 1997 and her assistance in her boyfriend's drug dealing posed a high risk of harm to Marcus that the mother never fully acknowledged.
Despite the commendably extensive reminders and encouragement that DCF provided the mother to engage in services after the adjudication of neglect, the mother persisted in being chronically noncompliant, elusive, and occasionally evasive. She did not complete most of the recommended services until late 1998 or later. The mother has never maintained housing and income adequate to raise a child. The mother neglected to request visits with Marcus for several months and has generally failed to inquire about his well-being or provide gifts or correspondence to him. At the visits, the mother has been appropriate, and it is clear that she loves Marcus, but she has maintained more of a passive visiting relationship with him than an active, nurturing parental relationship. The mother's responsibility for Michael's condition of failure to thrive in 1998 is also significant because it reveals the mother's disregard for the health of a young child and her inability to keep medical appointments.[8]
For all of these reasons, DCF has proven by clear and convincing evidence that the mother failed to rehabilitate herself. CT Page 16282
The mother contended at trial that the ground of failure to rehabilitate did not exist for more than one year and that there was no basis for a statutory waiver of the one year requirement. It is true that DCF filed its termination petition in May, 1998, only six months after the neglect adjudication. But in the failure to rehabilitate context, the date of the neglect adjudication does not necessarily start the one year period because "the statutory year does not require a fixed starting date." In re Felicia D., 35 Conn. 490, 497-98, 646 A.2d 862,cert. denied, 231 Conn. 931, 649 A.2d 253 (1994). In the present case, DCF became involved in, and the mother's failure to rehabilitate dates back to, January, 1997, which is well over one year before the May, 1998 adjudicatory date.
Alternatively, the court can waive the one year requirement if it finds "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." General Statutes (Rev, to 1997) §17a-112 (d)(1). The court finds a waiver here for two reasons. First, the mother did not comply with services until at least the fall of 1998, and thus the mother's failure to rehabilitate did in fact exist for a period of at least one year from the time of the neglect adjudication. Second, as discussed further in the next section, the combination of Marcus's special needs and his bonding to his foster mother make it in his best interest to waive the one year requirement and proceed with the dispositional phase.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Marcus M. clearly and convincingly requires termination of the parental rights of his natural parents. The father has consented to termination. Although the mother has now completed some of the classes and counseling that the expectations required, she has not necessarily benefitted [benefited]. Even after parenting classes, the mother still does not actively play with Marcus. She does not have stable housing or employment. She continues to enter into short-lived and, in the case of CT Page 16283 Michael H., unhealthy relationships with men resulting in children being born out of wedlock. She has failed to accept responsibility for her actions and their impact on Marcus, making it less likely that she will improve her parenting style in the future.
Marcus was lucky to have been taken out of drug culture of his natural parents and placed in foster care. He was even luckier to have been placed with Cathy S. Together with Marcus's preschool special education program, Cathy S. is responsible for helping Marcus overcome his profound delays. As a teacher herself, Cathy S. has taught her foster child well. Marcus is now a happy and relatively healthy five year old boy.
The strong bond between Cathy S. and Marcus fully warrants termination of parental rights so that Cathy S. can adopt him. But both Cathy S. and Marcus recognize that Marcus has another mother with whom he has lived and has some ties. Cathy S.'s willingness to work with Terri M. on a visitation schedule thus represents both an appropriate and an enlightened approach to the adoption issue. This court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaudv. Wawruck, 209 Conn. 407, 415, 551 A.2d 738 (1988).
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P.,39 Conn. App. 353, 362, 664 A.2d 1168 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Marcus and visitation to the mother with transportation assistance. DCF referred the mother a wide variety of services and repeatedly encouraged her to attend. These services were relevant to the parent's needs and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child CT Page 16284 Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the mother appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On November 17, 1997, the court entered the following expectations for the mother to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the child as often as DCF permits, (4) participate in counseling: parenting, individual, drug/alcohol, and domestic violence, 5) secure and maintain adequate housing and income, 6) no substance abuse, 7) no involvement with the criminal justice system, 8) sign releases as requested, 9) remain free from abusive relationships, and 10) cooperate with random urines and hair analysis. As detailed above, DCF substantially met its obligation to provide assistance. The mother's compliance with these expectations was inadequate, especially in the areas of keeping appointments set by DCF, obtaining the recommended counseling, and maintaining adequate housing and income.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Marcus is closely bonded to his foster mother. Marcus recognizes and has some affection for his natural mother.
5) The age of the child.
Marcus is five years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to CT Page 16285 reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the mother did not adjust her circumstances in time to make it in Marcus's best interest to return to her home. The mother did maintain visitation, although the quality of the visits was not the highest. The mother has generally failed to inquire of DCF concerning Marcus's well-being in the foster home.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the mother's difficulties stem primarily from her own troubled background and poor lifestyle choices and not from unreasonable interference of other persons or economic circumstances beyond her control.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Marcus M. for a termination of parental rights to enter with respect to the father, Matthew M., and the mother, Terri M. Accordingly, the court grants the petition to terminate parental rights. The court further orders that the Commissioner of DCF is appointed statutory parent for Marcus for the purpose of securing an adoptive family. If the current foster mother is willing to adopt, it is the court's direction that she receive first consideration. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman, Judge, Superior Court